UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| KELLY BENTZ, individually; ANDY & LESLIE CAMERON, individually; CLIFFORD CECCHI & CARL KNIGHT, individually; IAN & LINDA GRAY, individually; ALISHA JAMES, individually; TONY MCKOY, individually; RHONDA MITCHELL, individually;          *Plaintiffs*,    v.    TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; BEIJING NEW BUILDING MATERIALS (GROUP) CO., LTD.; BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED CO.; CHINA NATIONAL BUILDING MATERIAL CO., LTD.; and, TAI'AN TAISHAN PLASTERBOARD CO., LTD.;          *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    Case No. 1:17-cv-02892-AT |

**AMENDED COMPLAINT**

Plaintiffs allege that the Defendants' defective drywall products have been found in their

Georgia homes. Each Plaintiff properly executed an exclusion form, opting-out of a nationwide

class action settlement with the Defendants named herein and have chosen to pursue their

individual claims. Pursuant to Fed.R.Civ.P.20, Plaintiffs have permissively joined as parties in

this action against these Defendants because their claims arise from a common series of actions

or occurrences. The Defendants in this action are liable for damages incurred by Plaintiffs due to

their role in the design, manufacture, importing, distributing, delivery, supply, marketing inspecting, installing, or sale of the defective drywall at issue in the litigation.

## JURISDICTION, VENUE, AND PARTIES

1.        This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. §1332(a)(2) as the amount in controversy for each Plaintiff exceeds $75,000.00, exclusive of interest and costs.  Plaintiffs are owners of real property in Georgia and all Defendants are foreign business entities; thus, complete diversity exists.

2.        This Court has supplemental jurisdiction over this matter under 28 U.S.C. §1367 as all Defendants are subject to the Georgia Long-Arm Statute, O.C.G.A. §19-10-91, for the tortious conduct described herein.

3.        Venue in this district satisfies the requirements of 28 U.S.C. § 1391(b) and (c) because all Plaintiffs reside in United States, most currently reside in the State of Georgia within this jurisdiction and a substantial amount of the events and occurrences giving rise to the claim occurred in this district, or a substantial part of the property that is the subject of this action is situated in this district, while all Defendants are foreign business entities with no principle place of business or corporate headquarters located within Georgia.

4.        Plaintiff, Kelly Bentz, is a citizen of Georgia and owns real property located at 308 Stallings Drive, McDonough, GA 30252.  Plaintiff is bringing claims against the manufacturing defendants as set forth in the following paragraphs of this Complaint.

5.        Plaintiffs, Andy & Leslie Cameron, are citizens of Georgia and own real property located at 280 Sagamore Cove, Sugar Hill, GA 30518.  Plaintiffs are bringing claims against the manufacturing defendants as set forth in the following paragraphs of this Complaint.

6.      Plaintiffs, Clifford Cecchi and Carl Knight, are citizens of Georgia and own real property located at 5818 Deer Crossing Drive, Sugar Hill, GA 30518.  Plaintiffs are bringing claims against the manufacturing defendants as set forth in the following paragraphs of this Complaint.

7.      Plaintiffs, Ian & Linda Gray, are citizens of Georgia and own real property located at 25 Clear Spring Lane, Oxford, GA 30054.  Plaintiffs are bringing claims against the manufacturing defendants as set forth in the following paragraphs of this Complaint.

8.      Plaintiff, Alisha James, is a citizen of Georgia and owns real property located at 3360 Hagger Way, East Point, GA 30344.  Plaintiff is bringing claims against the manufacturing defendants as set forth in the following paragraphs of this Complaint.

9.      Plaintiff, Tony McKoy, is a citizen of Georgia and owns real property located at, 2046 Reserve Parkway, McDonough, GA 30253.  Plaintiff is bringing claims against the manufacturing defendants as set forth in the following paragraphs of this Complaint.

10.     Plaintiff, Rhonda Mitchell, is a citizen of Georgia and owns real property located at, 94 Silver Top Drive, Grayson, GA 30017.  Plaintiff is bringing claims against the manufacturing defendants as set forth in the following paragraphs of this Complaint.

11.     Defendant, Taishan Gypsum Company, Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. is a foreign corporation doing business in several States, including but not limited to, Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas and Virginia.  Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including the State of Georgia. Upon

information and belief, Defendant has continuously conducted business with suppliers and distributors within the United States which has resulted in defective drywall being systematically distributed and sold in the United States and installed structures throughout the United States. Based on information and belief, this defendant manufactured defective drywall and then sold, directly and indirectly, to certain suppliers within the United States.

12.    Defendant Tai'an Taishan Plasterboard Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. (hereinafter "TTP") is a foreign corporation doing business in several States, including but not limited to, Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas and Virginia.  Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including the State of Georgia. Upon information and belief, Defendant has continuously conducted business with suppliers and distributors within the United States which has resulted in defective drywall being systematically distributed and sold in the United States and installed structures throughout the United States.  Based on information and belief, this defendant manufactured defective drywall and then sold, directly and indirectly, to certain suppliers and distributors within the United States.

13.    Defendant TTP is a wholly owned subsidiary of Defendant Taishan. Defendants TTP and Taishan are hereinafter collectively referred to as "Taishan".

14.    During the period when Taishan and its subsidiaries were distributing defective drywall to the United States, these entities consistently misrepresented the drywall they were exporting complied with ISO and ASTM quality standards. For instance, Taishan's website

4

boasted that it was exporting large quantities of drywall to the United States and that its drywall complied with ISO quality standards. The employees of Taishan and its subsidiaries also sent emails to potential customers boasting about their experience exporting large quantities of drywall to the United States. These employees also provided false assurances that the drywall they were exporting complied with ASTM quality standards.

15.    Defendant BNBM is a foreign corporation doing business in several States, including but not limited to, Alabama, California, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia. Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including Georgia.  Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States.  Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States.

16.    On April 21, 2017, Judge Fallon in MDL 2047 issued an Order and Reasons on Defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b) (hereafter "Rule 12(b) Order"). *See* Rec.Doc.No. 20739. The Rule 12(b) Order correctly determined that:

*    BNBM is the controlling shareholder of Taishan and that Taishan is an agent and alter ego of BNBM.

\*    BNBM is controlled by China National Building Materials Group Co. ("CNBM Group").[1]

\*    BNBM has exercised a high degree of control over Taishan's operational management and its day to day operations.

\*    BNBM has had voting control over Taishan's board since 2005.

\*    BNBM controls Taishan's board and management team.

\*    BNBM audits Taishan and requires that Taishan submit weekly reports.

\*    BNBM must approve certain activities by Taishan including the building of factories and all matters concerning drywall production.

\*    BNBM controls Taishan's financial and strategic business decisions.

\*    Taishan must provide BNBM with a stake in all of its subsidiaries.

\*    BNBM and Taishan share officers, directors, and executives.

\*    Taishan and BNBM also share certain property.

\*    BNBM provides Taishan with loan guarantees.

17.    On October 13, 2015, CNBM publicly announced that BNBM will acquire 100% of Taishan's shares.  BNBM subsequently acquired 100% of Taishan's shares on October 27, 2016.

18.    BMBM consistently exerted control over Taishan and its subsidiaries when these entities were exporting defective drywall to the United States. For instance, one of BNBM's board members, Tongchun Jia, is the chairman of the board of directors and general manager of

---

[1] CNBM Group is not being pursued as a defendant in the instant complaint as CNBM Group has been dismissed as a defendant by Judge Fallon. The order of dismissal is interlocutory and is subject to appeal at a later date.

Taishan. Mr. Tongchun Jia occupies similar positions with most of Taishan's subsidiaries. Through Mr. Tongchun Jia's positon with Taishan and its subsidiaries, BNBM controls the actions and operations of these entities. Even where Tongchun Jia does not formally hold a position with a Taishan subsidiary, BNBM is able to exert its control over the subsidiary through Mr. Tongchun Jia's influence. For instance, the chairman of the board of TTP, Peng Shi Liang, was also an employee of Taishan. BNBM was thus able to control TTP since the chairman of its board reported directly to Tongchun Jia. Accordingly, since BNBM had direct control over Taishan and its subsidiaries, it should be held responsible for their sale of defective drywall.

19.    Defendant, BNBM Group is a foreign corporation doing business in several States, including but not limited to, Alabama, California, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia. Upon information and belief, Defendant, together with its affiliates, subsidiaries and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including Georgia. Upon information and belief, Defendant, together with its affiliates, subsidiaries and/or actual or apparent agents, have continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant, together with its affiliates, subsidiaries and/or actual or apparent agents, manufactured and sold, directly and indirectly, to certain suppliers in the United States.

20.    Defendant, CNBM is a foreign corporation doing business in several States, including but not limited to, Alabama, California, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia. Upon information and belief,

Defendant, together with its affiliates, subsidiaries and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including Georgia.  Upon information and belief, Defendant together with its affiliates, subsidiaries and/or actual or apparent agents, has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant, together with its affiliates, subsidiaries and/or actual or apparent agents, manufactured and sold, directly and indirectly, to certain suppliers in the United States.

21.    The Rule 12(b) Order correctly determined that CNBM is the controlling shareholder of BNBM.

22.    To the extent any of the foreign defendants are deemed to be foreign sovereign entities, including but not limited to Taishan, TTP, BNBM, BNBM Group, and CNBM, Plaintiffs bring their claims against these entities pursuant to 28 U.S.C. 1605(a)(2), the commercial activity exception to the Foreign Sovereign Immunities Act, or alternatively under 1605(a)(5), the tortious act exception. Plaintiffs allege that the claims against the foreign defendants are based upon commercial activities carried on in the United States. The claims also seek monetary damages against a foreign state for damage to property occurring in the United States, caused by the tortious acts or omissions of that foreign state, or of any official or employee of that foreign state while acting within the scope of his office or employment.

## FACTS REGARDING THE DEFENDANTS

23.    Upon information and belief, CNBM Group, together with its affiliates, subsidiaries and/or actual or apparent agents, manufactured, sold, distributed, marketed and

placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Alabama, California, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia. Upon information and belief, CNBM Group, together with its affiliates, subsidiaries and/or actual or apparent agents, has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. CNBM Group, together with its affiliates, subsidiaries and/or actual or apparent agents, manufactured and sold, directly and indirectly, to certain suppliers in the United States.

24.    The Rule 12(b) Order correctly determined that:

*    CNBM Group is the controlling shareholder of CNBM and BNBM Group.

*    CNBM Group is the controlling shareholder of BNBM and Taishan by virtue of its control over CNBM and BNBM Group.

*    All the Defendants operate as a single-business enterprise that is led by CNBM Group.

25.    CNBM Group has exerted high levels of control over its subsidiary entities, including but not limited to CNBM, BNBM, BNBM Group, Taishan, and TTP, by virtue of its scheme of appointing overlapping officers and directors of subsidiary entities, its use of notices and management reports sent to subsidiaries, its requirement that its direct subsidiaries manage investments in subsidiaries pursuant to CNBM Group directives, the implementing of policies for conducting audits, and its requirement that subsidiaries submit various reports. Many CNBM Group officers and directors hold positions with BNBM and Taishan. The

Company culture of CNBM Group establishes a "Parent-subsidiary" company that is managed and directed strictly from the top down. For instance, one of CNBM Group's indirect subsidiary entities, BNBM, owns the majority of Taishan's shares and has the ability to appoint the majority of Taishan's board of directors. CNBM Group controls BNBM by virtue of another CNBM Group subsidiary, CNBM, which is the parent entity of BNBM. CNBM Group has exerted day-to-day control over each of its subsidiary entities and has used its influence to direct specific activities and to appoint officers and directors that are beholden to CNBM Group. Upon information and belief, this influence was exerted with respect to permitting Taishan and BNBM to market, export, and distribute drywall to the United States and the decision for Taishan to not appear at Judgment Debtor proceedings before Judge Fallon in New Orleans.

26.     For instance, at the outset of the MDL 2047, CNBM Group in conjunction with its controlled subsidiaries, Taishan and BNBM, discussed and then implemented a deliberate strategy whereby Defendants would not respond to the litigation and would allow default judgments to be entered against them. Defendants have also shared lawyers and law firms. When Taishan finally responded to this litigation, it did so for the limited purpose of contesting personal jurisdiction. When Taishan was unsuccessful in obtaining dismissal on these grounds and lost its appeal to the Fifth Circuit Court of Appeals, it withdrew from the litigation with the approval of its parent entities and was subsequently held in civil and criminal contempt on July 17, 2014. Following the issuance of this contempt order, CNBM Group directed its subsidiaries to cease depositing funds in New York banks.

## FACTS REGARDING DEFECTIVE DRYWALL

27.     Defendants' drywall is predominately composed of gypsum.

28.     In "defective drywall" (such as that designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold by Defendants herein), sulfur compounds exit the drywall.

29.     The sulfur compounds, including Hydrogen Sulfide, Carbonyl Sulfide, and Carbon Disulfide, exit Defendants' drywall and cause rapid sulfidation and damage to personal property (such as the blackening and break down of air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property). These compounds are not only harmful to personal property but they are also smelly and irritating to humans and pets.

30.     Although the drywall functions according to its intended purpose as a building component, it is unfit for this purpose due to the damaging side effects and/or because its use is so inconvenient that Plaintiffs would not have purchased their homes had the side effects been disclosed by Defendants.

31.     As a direct and proximate result of Defendants' actions and omissions, Plaintiffs' structures and personal property have been exposed to Defendants' defective drywall and the harmful effects of the sulfur compounds that exit from Defendants' defective drywall.

32.     Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed and/or sold the defective drywall, which was unfit for its intended purpose in that the drywall caused rapid sulfidation and damage to personal property in Plaintiffs' homes, residences or structures.

33.     Defendants recklessly, wantonly, and/or negligently manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed and/or sold the defective drywall at issue in this litigation.

11

34.     Defendants recklessly, wantonly and/or negligently implemented faulty procedures for purposes of formulating, preparing, testing, and otherwise ensuring the quality and/or character of the defective drywall at issue in this litigation.

35.     As a direct and proximate result of Defendants' defective and unfit drywall and the harmful effects of the sulfur compounds that exit these products, Plaintiffs have suffered, and continue to suffer economic harm.

36.     As a direct and proximate result of Defendants' defective drywall and the harmful effects of the sulfur compounds that exit these products, Plaintiffs have a need for injunctive relief in the form of repair and remediation of their home, rescission of contracts, and the ordering of emergency/corrective notice.

37.     Defendants recklessly, wantonly, and/or negligently failed to implement procedures for safely formulating, preparing, testing, and otherwise ensuring that the drywall at issue in this litigation was safe for consumers.

38.     After learning that their products being sold in the United States was defective, Defendants took no action required under federal law (see Consumer Product Safety Act, 15 U.S.C. § 2051, *et seq*.) to notify their importers, distributors, agents, or consumers of the harmful effects caused by their drywall.

39.      After learning that their products being sold in the United States was defective, Defendants took no action and initiate a corrective action plan.

40.     By failing to take action to notify potential victims or attempt to implement a corrective action plan for the damage their defective drywall products caused, Defendants directly violated the federal CPSA that specifically requires that when a manufacturer has reason

to know its product does not meet safety standards, contains a defect, or creates and unreasonable risk of death or injury, it must inform the CPSC. (See 15 U.S.C. 2064(b)).

41.    Plaintiffs' damages include, but are not limited to, cost of inspection; cost and expenses necessary to fully remediate their homes of defective drywall, cost of alternative living arrangements, economic hardship resulting in lower credit ratings leading to higher interest rates on loans and credit cards, lost value or devaluation of their homes and property; loss of use and enjoyment of their home and property, and/or damages associated with personal injuries.

42.    As a direct and proximate result of Defendants' defective and unfit drywall and the harmful effects of the sulfur compounds that exit these products, the Plaintiffs have suffered, and continue to suffer damages. These damages include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the defective drywall and other property that has been impacted; lost value or devaluation of their homes, residences or structures and property as a direct result of damage caused to the property and indirect damage resulting from perceived defects to the property, including stigma damages and loss of use and enjoyment of their home and property.

## COUNT I
## NEGLIGENCE

43.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth fully herein.

44.    Defendants owed a duty to Plaintiffs to exercise reasonable care in designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing this drywall, including a duty to adequately warn of their failure to do the same.

13

45.      Defendants knew or should have known that their wrongful acts or omissions would result in harm and damages in the manner set forth herein.

46.      Defendants breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing this drywall.

47.      Defendants likewise breached their duties to Plaintiffs by failing to warn about the defective nature of the drywall.  Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the homes and bodies of Plaintiffs.

48.      Defendants breached their duty to exercise reasonable care to timely remove and/or recall from the market and/or otherwise prevent the continued contact of Plaintiffs with the drywall, upon learning it had been sold in an unreasonably dangerous condition.

49.      Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs.

50.      As a direct and proximate cause of Defendants' acts or omissions, Plaintiffs were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT II
## NEGLIGENCE PER SE

51.      Plaintiffs adopt and restate the preceding paragraphs as if fully set forth fully herein.

52.      Defendants owed statutory duties to Plaintiffs to exercise reasonable care in designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing this drywall.

14

53.     Defendants breached their statutory duties to Plaintiffs by failing to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing this drywall.

54.     Defendants likewise breached their statutory duties, including but not limited to those imposed under the International Building Code ("IBC") and other state and local building codes, to Plaintiffs by failing to warn about the defective nature of the drywall.  For instance, it is specifically alleged that Defendants furnished the drywall in violation of ASTM C 1396/C 1396M-069, and its predecessor(s).

55.     Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the homes and personal property of Plaintiffs.

56.     Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or injuries to Plaintiffs.

57.     As a direct and proximate cause of Defendants' acts or omissions, Plaintiffs were harmed and have incurred damages as described herein.

## COUNT III
## STRICT LIABILITY

58.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth fully herein.

59.     At all times relevant hereto, Defendants were in the business of distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

60.     The drywall, including that installed in the homes of Plaintiffs was placed by Defendants into the stream of commerce.

61.     Defendants knew that the subject drywall would be used without inspection for defects by consumers.

62.     Defendants intended that the drywall reach the ultimate consumers, such as Plaintiffs, and it indeed reached Plaintiffs when it was installed in their homes.

63.     When installed in Plaintiffs' homes, the drywall was in substantially the same condition as it was in when Defendants manufactured, sold, and/or delivered it.

64.     At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

65.     The subject drywall was not misused or altered by any third parties.

66.     The Defendants' drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, and sold.

67.     The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing.

68.     The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gasses and/or other chemicals through off-gassing.

69.     The drywall was also defective because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

70.     The Defendants' defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to Plaintiffs.

16

71.    The drywall is also defective and unreasonably dangerous because Defendants failed to adequately warn and instruct Plaintiffs of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

72.    Plaintiffs were neither aware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs, acting as reasonably prudent people discover that Defendants' drywall was defective, as set forth herein, or perceive its danger.

73.    Defendants' defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs.

74.    The benefit, if any, of Plaintiffs using Defendants' defective drywall was greatly outweighed by the risk of harm and danger.

75.    The defects in the drywall, as well as Defendants' failure to adequately warn Plaintiffs of the defects rendered the drywall unreasonably dangerous, was the direct and proximate cause of damages, and/or led to the personal injuries of Plaintiffs.

**COUNT IV**
**BREACH OF EXPRESS AND/OR IMPLIED WARRANTY**

76.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

77.    Defendants and/or their agents were in privity with Plaintiffs and/or Plaintiffs were foreseeable third-party beneficiaries of any warranty.

78.    At the times Defendants installed, utilized, supplied, inspected, sold, and/or installed this drywall for use in the Plaintiffs' homes, Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in the Plaintiffs' homes for use as a building material, and expressly or impliedly warranted the product to be fit for that use.

79.    Defendants placed their drywall products into the stream of commerce in a defective condition and these products were expected to, and did, reach users, handlers, and

persons coming into contact with said products without substantial change in the condition in which they were sold.

80.     The drywall was defective because it was not fit for the uses intended by Defendants; to wit, the installation of the drywall in Plaintiffs' homes was not suitable for use as a building material, because it contained the defects as set forth herein.

81.     The Defendants breached their warranty because the drywall was not fit and safe for the particular purposes for which the goods were required (to be installed in Plaintiffs' homes as a building material) due to the defects set forth herein.

82.     Defendants had reasonable and adequate notice of the Plaintiffs' claims for breach of warranty and failed to cure.

83.     As a direct and proximate cause of Defendants' breach of warranties, Plaintiffs have incurred harm and damages as described herein.

<u>**COUNT V**</u>
**GEORGIA PRODUCTS LIABILITY STATUTE**

84.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

85.     In addition to any and all damages, attorneys' fees and other remedies made available to Plaintiffs under the warranty of fitness and/or warranty against defects, the Manufacturing Defendants are liable to Plaintiffs under the Georgia Products Liability Statute, O.C.G.A. §51-1-11 *et seq*.

86.     The Manufacturing Defendants, upon information and belief, expressly warranted that "the gypsum boards manufactured and sold… are guaranteed to be free from defects in materials and workmanship."

87.     The Manufacturing Defendants expressly warranted that "the gypsum boards were manufactured in accordance with "ASTM C 1396."

88.     The drywall at issue is, in all cases, unreasonably dangerous by virtue of the unreasonable off-gassing and/or emission of sulfur compounds and/or other corrosives, toxins and/or irritants, which do not in any way contribute to or enhance the utility of the drywall, yet pose a risk to the wiring, plumbing, appliances, personal property, overall economic value of the property and financial security of the owner, and/or the health of the residents of the property.

89.     At all times pertinent and material hereto, Defendants knew that their drywall was unreasonably dangerous and/or defective as set forth herein.

90.     In the alternative, Defendants should have, at all times pertinent and material hereto, known of the unreasonably dangerous and/or defective characteristics and/or conditions, had the reasonably employed then-existing scientific and/or technical knowledge, reasonable testing, and/or other reasonable and then-accepted methods of quality assurance and/or quality control.

91.     Defendants' drywall is unreasonably dangerous in composition or construction in that, at the time it left Defendants' control, it deviated in a material way from Defendant's own specification or performance standards.

92.     In addition, and in the alternative, defendants' drywall is unreasonably dangerous in design, in that, at the time the drywall left Defendant's control, there existed an alternative design for the product that was capable of preventing Plaintiffs' damage, and the likelihood of causing Plaintiffs' damage and the gravity of that harm outweighed the burden (if any) on the Defendant in adopting such alternative design and the adverse effect (if any) on the utility of the drywall.

93.    In addition, or in the alternative, Defendants' drywall is unreasonably dangerous in that it fails to conform to an express warranty about the product which induced the use of the product and caused damage to Plaintiffs to the extent that the warranty was untrue.

94.    In addition, or in the alternative, Defendants' drywall is unreasonably dangerous due to an inadequate warning, in that, at the time the drywall left Defendant's control, the drywall possessed a characteristic that might cause damage and yet Defendant failed to use reasonable care to provide an adequate warning of such characteristics and/or dangers to users and/or handlers of the drywall.

95.    Defendants are therefore liable to Plaintiffs for all damages reasonable in the premises.

**COUNT VI**
**PRIVATE NUISANCE**

96.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

97.    The Defendants' tortious or wrongful acts or omissions have caused sulfide gas and/or other chemical leaching into Plaintiffs' homes which has unreasonably interfered, and continues to interfere, with the Plaintiffs' use and enjoyment of their properties and caused them harm and damage as discussed herein.

98.    Defendants' interference has impaired the rights of Plaintiffs' health, comfort, safety, free use of their property, and/or peaceful enjoyment of their property.

99.    Defendants' invasions were intentional and unreasonable, and/or unintentional but otherwise negligent or reckless.

100.    The interference with Plaintiffs' use of their property caused by Defendants is substantial and is ongoing.

101.    Defendants' private nuisance was the direct, proximate, and foreseeable cause of Plaintiffs damages, injuries, harm, loss, and increased risk of harm, which they suffered and will continue to suffer.

102.    As a direct and proximate cause of Defendants' creation of a private nuisance, Plaintiffs have incurred harm and damages and/or personal injuries as described herein.

## COUNT VII
## NEGLIGENT DISCHARGE OF A CORROSIVE SUBSTANCE

103.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

104.    Defendants had actual or constructive knowledge of the extremely corrosive and dangerous propensities of the drywall at issue in this litigation.

105.    Notwithstanding their actual or constructive knowledge of the corrosive and dangerous propensities of the drywall, defendants nevertheless designed, manufactured, imported, distributed, delivered, supplied, marketed, inspected, installed, or sold the drywall for use in the homes or other structures owned by Plaintiffs.

106.    By causing the sale, distribution, delivery, and/or supply of the drywall under these circumstances, Defendants breached their duty to exercise reasonable care and created a foreseeable zone of risk of injury to Plaintiffs.

107.    Defendants likewise breached their duties to Plaintiffs by failing to warn about the corrosive and dangerous propensities of the drywall.  Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs.

108.    Plaintiffs have suffered injuries by virtue of their exposure to the defective drywall at issue in this litigation.  Given the defect in the Defendants' drywall, Defendants knew or should

have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs.

109.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs were harmed and have incurred damages and/or personal injuries as described herein.  The injuries sustained by Plaintiffs are within the foreseeable zone of risk created by Defendants.

## COUNT VIII
## UNJUST ENRICHMENT

110.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

111.    Defendants received money as a result of Plaintiffs' purchase of Defendants' defective drywall, or purchase of homes containing this drywall, either directly or through an agent, and Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiffs.

112.    Defendants' acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendants to retain the benefit without payment of the value to the Plaintiffs.

113.    Defendants, by the deliberate and tortious conduct complained of herein, have been unjustly enriched in a manner which warrants restitution.

## COUNT IX
## VIOLATION OF CONSUMER PROTECTIONAL ACTS

114.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

115.    This is an action for relief under the Ga. Code Ann. § 10-1-393, et seq. (Georgia Consumer Protection Act).

116.    The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this complaint, including but not limited to, the knowing

misrepresentation or failure to disclose the source, affiliation, origin, characteristics, ingredients, standards and quality of defective drywall constitute violation of the provisions of the Georgia Consumer Protection Act.

117.    Plaintiffs have suffered actual damages as a result of Defendants' violation of this Consumer Protection Act and are entitled to relief.

118.    As a direct and proximate cause of Defendants' violations of the Georgia Consumer Protection Act, Plaintiffs have incurred harm and damages as described herein.

## COUNT X
## EQUITABLE AND INJUNCTIVE RELIEF

119.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

120.    Plaintiffs are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

121.    Plaintiffs will suffer irreparable harm if the Court does not render the injunctive relief as set forth herein, and if Defendants are not ordered to recall, buy back, rescind, and/or repair the homes and structures owned by Plaintiffs.

122.    Plaintiffs, demand injunctive and equitable relief and further, that Defendants be ordered to: (1) to remediate, repair and/or replace the drywall in the homes and structures upon proof by the Defendants of the feasibility of such remedy or repair; (2) cease and desist from misrepresenting to the general public that there is no defect in, or danger associated with the drywall; (3) institute, at their own cost, a public awareness campaign to alert the general public of the defect and dangers associated with the drywall;

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable as a matter of right.

23

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs demand upon Defendants jointly and severally for:

    a.   Compensatory, statutory, and/or punitive damages as allowed by law;

    b.   Pre and post-judgment interest as allowed by law;

    c.   Injunctive relief;

    d.   An award of attorney's fees as allowed by law;

    e.   An award of taxable costs; and

    f.   Any and all such further relief as this Court deems just and proper.


Respectfully submitted:

s/ James V. Doyle, Jr.
James V. Doyle, Jr. (GA Bar No. 228498)
DOYLE LAW FIRM, PC
2100 Southbridge Pkwy., Suite 650
Birmingham, AL 35209
Tele: 205-533-9500
Fax: 205-414-7528
jimmy@doylefirm.com

*Attorney for Plaintiffs*


Dated: October 26, 2020.